23-1246. Thank you. Mr. Pattis, am I passing your name card? Yes, Judge. And you left no time for one. I thought I'd asked for four. I was told it had to be two or three, so three. Three, okay. My name is Norm Pattis. I'm here on behalf of John Doe. And the issue here is whether the court deprived Mr. Doe of the benefit of every reasonable inference when he defended NYU's summary judgment motion. And we think it did not. And a good place to start is with the promissory estoppel claim that was dismissed earlier prior to the summary judgment motion, which we also think was granted in error. The standards for promissory estoppel in New York are a clear and unambiguous promise. And Mr. McFarlane, the representative, said under no circumstances would he be expelled from NYU, given the facts and circumstances here. No weapon was involved. There was no claim of actual sexual misconduct. Then was there reasonable and foreseeable reliance? I will concede the points that my colleagues made, that that's an objective rather than a subjective standard. But under either standard, Mr. Doe gets the benefit. And then was there an injury? And the injury is the more interesting question in this case. And I think it goes to the nature in which the hearing was conducted. I recited Lafler and Cooper, a couple of Sixth Amendment effective assistance of counsel cases, not to suggest that there is a Sixth Amendment right to counsel in an academic disciplinary proceeding, but to illustrate to the court what was at stake in the relationship between Mr. McFarlane and the client. We all know that when a person is accused of a crime, what you read in the press is the maximum exposure. Somehow the press says so-and-so faces 50 years. If he pleads, it's going to be a lot less. If he tries, it could still be less, depending on what the sentencing factors are that the court finds. In this instance, Mr. Doe relied on a university representative familiar with the process in much the same way that a criminal defense lawyer would be presumed. Did he know that the faculty advisor would not play a role in deciding his penalty? You know, that's an excellent question, and I don't have an answer to that. I don't think the record is clear on that. But don't you have to prove that he reasonably relied on an unambiguous promise? I do. Okay, so if— It's a forecast. So if you come—this is why the Lafler case is so apt. In the Lafler case, a man shoots somebody in the knees and he's charged with attempted murder. His lawyer says, they'll never convict you of murder. Nobody dies from being shot in the knees. Guess what? Attempted conviction—a conviction for attempted murder. The result was plainly incompetent. The lawyer gave a forecast based on his experience that the client relied on. But this was not—this didn't have an attorney-client relationship. We're not talking about ineffective assistance of counsel here. We don't have to be. It's a faculty advisor who is familiar with the process. We're dealing with a young man on the cusp of adulthood, probably still an adolescent, unfamiliar with the process, and who acknowledges, by the way, certain misconduct. He acknowledged a violation of a no-contact order. So he comes in saying, look, I know I'm going to get hurt. And the guy says, don't worry about it. You're not going to be expelled. Under no circumstances will you be expelled. I say that drove the course of the litigation, referring to this as litigation going forward, because it became a low-stakes game. And how did it matter? Look to— Well, but don't you still have to prove that it was reasonable for him to rely on a faculty member who is not a decider? Yes, but I think it is reasonable in this context for the reason that he's the person the university recommended and he's the person my client chose. And he didn't choose him out of a phone book. He didn't choose him because the fees were right. He didn't choose him for his good looks. He chose him because he was familiar with the process and he was relying on him. And I think it was reasonable for him to do so. And I think that satisfies an objective test. They didn't pick people from the dining hall. You know, they picked people who were presumably familiar with the process. And these processes are highly idiosyncratic. They're non-adversarial in character. OK. I'm not sure that that would meet the standard of reasonableness. But would you have a—even if it were, would you have a claim if it's just, first of all, was wrong? I mean, they can't—that can't be the standard, right? To be 100 percent accurate can't be the standard that you backward-impose onto reasonableness, right? It's not. But for purposes of summary judgment, I think I'm entitled to every reasonable inference. And the inference was that he relied on a man and the reliance was reasonable. His reliance was, and the forecast wasn't irresponsible. What did he do to rely? Did he alter his position in any respect? I think that—I'm not sure the underlying briefing at the district court says that in so many words. But I'd like to give you an illustration of what could have happened. No, I'm not interested. I'm not interested at all in what could have happened. I want to know what did happen. Did he alter his position in any respect as a result of the—what you call the promise? Drawing every inference in his favor, yes. When one of the administrators said to him that you can—in response to his claim that you can bring your complaint later, he didn't bring it later against the complainant. And had he brought it— What are we supposed to—what could a reasonable jury infer from the fact that he didn't bring his complaint later? That he deferred bringing his complaint against Jane Doe because he knew he wasn't going to be expelled and he didn't want to cause her further harm. Once he was expelled, he tried to bring the complaint and the university said, oh, we've never done this against somebody who's—on behalf of somebody who's not a student, even though they acknowledged they could. So he'd been sandbagged. So is that the best evidence that you think you have or that you allege? The best evidence, quite frankly, is on page—or it's in paragraphs 305 and 310 of the Statements of Undisputed Facts. What the university found immaterial because there was no complaint against her were her homophobic remarks against him, her kissing him while he was asleep, her punching him, her threatening him, her isolating him from his friends. As to the reliance? I'm sorry, as to the reliance? That's the best evidence you have for the reliance? No, I thought the question was how would the litigation have been different? In other words, she would have been subject to cross-examination on these issues, which the university regarded immaterial because her conduct didn't matter. And these go to her credibility. So what we ended up with was an aborted adversarial process because the university chose to believe the woman and what his claims were weren't relevant. Okay, so I wanted to switch gears and ask about this spreadsheet. Is the spreadsheet what you think is the best evidence that you have about gender discrimination? It's the only evidence I saw on the record. I didn't handle the underlying record, but it's the only evidence that I thought was available. Do my colleagues have any...?  I have a question. Mr. Pattis, you're familiar with the case of Dover Gaines Columbia University? Yes. As you may know, we clarified that pleading an inference of discrimination requires, and I quote, only minimal evidence supporting an inference of discrimination in order to prevail. So I take it you... And we restated that principle in the Cornell University case, venglatori against Cornell University. Would you, reflecting on the record that you have before you, marshal the evidence which would permit us to conclude that there is at least minimal evidence that supports an inference of discrimination in order for you to prevail? I would say it's minimal but existent in the form of other people who've been charged with similarly sounding crimes or allegations who've been given a lesser sanction. And it would be the table that Judge Sanchez referred to. No more than that. But that, I think, is all I need. Okay. Thank you so much. We'll hear from you in a moment. May it please the Court. Jeffrey Metzler on behalf of NYU. First, I'll just start with the question that Your Honor asked, whether there was evidence in the record that he understood his advisor would not play a role in making a determination of fact of the sanctions. There is evidence in the record, he admitted at his deposition, that he did understand that. That's at the appendix 176 and 177. But your colleague on the other side would say that that wasn't enough. He would say that the university paired them and that he had more information than he did and he was so confident on it that he had no reason to doubt the representation that was made to him. So can you respond to that argument? As the District Court found, it's not reasonable, and this is New York law, it's not reasonable to rely on a promise made by somebody who has no authority to make that promise. If I promise you that the Giants are going to win the Super Bowl, you can't bring a promissory estoppel claim against me if I'm wrong. How would a young undergraduate in a university know that and he couldn't rely on it? That's a very fancy lawyer-like statement. Well, there are several reasons, Judge Cabranes. First of all, he was advised, he was given multiple, multiple opportunities. He was advised by the Title IX coordinator. When he first met with her, that he could be expelled. He was advised by the investigators. When he met with them, that he could be expelled. He had the NYU policy and procedures, which made clear that he could be expelled. And immediately before his hearing, the notice of hearing said he could be expelled. Let me ask you, whose side were they on if one can ask such a question or answer such a question? What would somebody in his position believe? I think as this court recognized in the St. John's case, the university is not on a side in these proceedings. There is a complainant and there is a respondent. And the university is doing its best as a neutral fact finder to make a determination of responsibility. So the university was not on a side here. And so when they're giving him the notice, and I think the record, it's also clear in the record, that he did understand he and his mother, who is a lawyer, by the way, and was very involved in this process, admitted in multiple messages that they understood he was facing very serious consequences. There's a string site on the top of our brief on page 40 that lists all of the instances in which he acknowledged that he was facing very serious consequences. What about the reassurances that the penalty could not include or would not include expulsion? Yeah, that assurance, even to the extent that the advisor made that statement, and as Mr. Pattis characterized it as a forecast, a forecast is not a promise. That is also New York law. That's well established under promissory stop law. A forecast is not a promise. It has to be a clear, unambiguous promise. And so the statement that you won't be expelled was, at best, a prediction by somebody who had no authority to give it. And that's simply not one that just doesn't satisfy promissory estoppel under New York law. I also think that there's a causation problem here, which is that the alleged injury, which is his expulsion, was not a result of the alleged promise. It was his conduct, which is undisputed. There's overwhelming evidence in the record, and we provided this court with the full supplemental appendix, which is over 700 pages of evidence demonstrating that Mr. Doe violated NYU's sexual misconduct policy, and that's the reason why he was expelled. It had nothing to do with an alleged promise by his advisor. I'd also note that on his appeal, Mr. Doe did hire an attorney, and if you look at the appendix on page 93, 94, the materials that his attorney submitted did nothing to cast any doubt on the accuracy of the ultimate determination here by NYU. Perhaps you can help me understand the procedures here. Were you counsel from the beginning of this case? I have been since the... You represented NYU before the district court. Yes, Your Honor. Before Gregory Woods. Yes, Your Honor. Now, Judge Woods wrote a very substantial and careful opinion, and if one reads that opinion, one would find it difficult to imagine that in due course, pending a summary judgment motion, there would be any great difficulty in finding some material facts that were in dispute. But in any event, why don't we turn to the question of the audio and video during the proceeding, where he had some difficulty apparently in hearing the proceeding. He was in Australia, right? Correct. And the video feed from NYU was turned off for part of the hearing. NYU made no effort to rectify the situation or adjourn the hearing according to the allegations quoted by Judge Woods. As Judge Woods said, it's hard to imagine a much more fundamental procedural flaw than an inability to hear or see what was happening. Now, what are the facts in this record at the summary judgment stage with respect to audio and video connections and the ability of this plaintiff to hear and see what was happening? Well, first of all, I do think it's important to note that the opinion, and I think this is a critical distinction, Judge Woods's opinion was on a motion to dismiss. He was taking all of the allegations as true. And Discovery has demonstrated those allegations were not true. So that's a huge... Hold on a second. Just stop right there. Your view is that Discovery revealed that there were no audio or video problems at all? We provided the court... There were no significant audio or video problems that caused any meaningful difficulties. And I think that we provided the court with the full hearing transcript and our supplemental appendix for that reason. There was a deposition of the plaintiff in which I asked him whether he could identify any questions that he misunderstood or answered wrong or anything he wanted to clarify afterwards. He was unable to identify a single thing. In his appeal, I think it's worth noting, in his appeal to NYU, he never mentioned anything about technical difficulties during the hearing as one of the reasons that the hearing should be reconsidered. I also think one important thing to note with regard to Judge Woods's decision is that Judge Woods found evidence or claims of gender bias based on three allegations that were in plaintiff's amended complaint, which had to do with an August 2018 social media post, the suspension of a female professor, and Office of Civil Rights investigations. You don't see anything about those in this appeal. Why? Because there was no evidence to back any of those claims up. So those were the three factors that Judge Woods relied on in his opinion for showing gender bias, and none of them exist anymore because they weren't true. So Judge Woods took those allegations as true, and the plaintiff failed during the course of discovery to produce any evidence to support them. Okay, and I just want to make clear, I am reading the part of the appellant's brief where it talks about the technical challenges, but I'm not seeing an allegation of due process being violated. Is that correct? I mean, the argument isn't there was gender discrimination because he was having a Zoom problem in Australia. Is that correct? That is correct. I mean, the fact this court, I'm sure, as we're doing a video conference right here, I'm sure this court has experienced some of the technical difficulties that can occur when a hearing takes place over Zoom. But as your Honor suggests, there's no evidence that that has anything to do with gender bias. I'm talking about evidence. I'm talking about it wasn't raised, right, on appeal. It wasn't raised that the whatever technical issues were so difficult that he couldn't, that he didn't get a fair process. The closest I'm seeing was that he didn't get to accuse or examine her. That would be the closest thing to a due process violation. Is that correct? I think that is correct, Your Honor. I don't think and that's our point. I don't think that there's any I mean, there just isn't anything in the in the record. And I think that may be why you don't see it in the appellate brief, because there's nothing in the record to support such a claim. The hearing was entirely fair and you have the whole transcript. Actually, the audio is as well in the record below, if you want to care to listen to that. I see my time has expired. No, your time is our time. OK. What do we turn to the no contact order? He allegedly intended to file a report with NYU's public safety officer. But in his view, apparently NYU refused to investigate the report. Is that a fair statement about what the issue is regarding the no contact order? But the issue is not not what your view of it is. There is an issue about an alleged failure to an alleged attempt to file a report with NYU's public safety officer. Right. Correct. And the record would show that NYU refused to investigate that report. Is that correct? No, I don't think that is correct, Your Honor. I think there the record shows, in fact, that there were questions at the hearing about that incident. And just just to clarify that the incident that you're referring to, there were Mr. Doe violated and it's undisputed, violated the no contact order on several occasions after it was issued. He reached out immediately within 30 minutes to the complainant. And then when he saw her in a lounge, he confronted her physically. The incident that you're referring to, Judge Cabranes, took place in Washington Square Park. The two the two encountered each other. The complainant alleged that John was following her. He alleged that she was following him. The record shows that actually NYU's adjudicator did take testimony on that incident. And he wrote in his opinion that particularly given the prior conduct by John of continuing to violate the no contact order and stalking and sexually harassing Jane, which is the 300 pages in the in the record that he did not find credible the explanation by John that Jane was following him. So NYU did investigate that, did actually discuss it at the hearing, took questions on it and just found him not credible. Would it be fair to say that let me try to identify what may be two genuine disputes of material fact regarding differential treatment, that is, that he was treated differently than a similarly situated individual during the Title IX investigation? One was that the plaintiff, according to the plaintiff, reported Jane Rose behavior in Washington Square Park. And the second, as far as I can see, was when he raised the possibility of bringing a counterclaim to Senior, S-I-G-N-O-R. He was he was sufficiently similarly situated as Jane Roe. And the claim is that by the plaintiff that he did not file a counter complaint because he didn't want to distress Jane. And by contrast, the plaintiff claims he was not similarly situated to Jane Roe when his complaint was denied after he was expelled because he was no longer a student. So let's begin with the the plaintiff's reported report of Jane Rose behavior in Washington Square Park. Why isn't there a genuine dispute of material fact on that? Well, it goes to how NYU treated treated the conduct or NYU, what NYU did not. I mean, it's not it's not for the district court or this court to relitigate what happened in Washington Square Park. And that, I think, was the clear message from the St. John's case. And what is undisputed in this case is that the complainant did not file a cross complaint. He was asked on multiple occasions if he wanted to file a complaint against Jane. And he declined his as the district court found his reason for declining doesn't make him similarly situated. If anything, his reason for declining that he thought it would be handled later, even if you accept that as true. That is, is at best shows that NYU has a policy where it doesn't it will investigate the first complaint. It has an informal race to the dean policy. And as this court found in the St. John's case, and I believe it's also the first department. Sorry, the First Circuit in the Haydack case that does not amount to gender discrimination. Not even if it were true that they failed to investigate because it was a cross complaint. Well, it's your point that there was a genuine dispute at the hearing, a factual dispute. But once the hearing officer ruled that credibility, there was no longer a factual dispute in the main case. Very well put here on her. Yes, that that is correct. There was a factual dispute at the hearing, and it was resolved by NYU. There's no but there's no factual dispute, no material dispute here on summary judgment as to regards NYU's conduct. Jane and John were not similarly situated because he did not file a cross complaint. And that's undisputed. In fact, I mean, the only the only record, only evidence in the record with respect to cross complaints, is that NYU has investigated cross complaints by male respondents against female respondents on multiple occasions. And that's in the appendix of page eight, paragraph 16. My colleagues, do you have any more questions? OK, thank you. Thank you. Mr. Patas, you have three minutes. Thank you, Judge. Can you clarify if you have alleged a due process violation on the part of the technical difficulties in the hearing? We noted it, but frankly, you didn't, but you didn't know it candidly on review. This was a difficult brief to write, not being trial counsel, given the number of exhibits. So we studied the material facts, and I didn't think that there was enough to raise it on the technical difficulties. I think the record reflects he had some difficulty following along and used some computers, two computers to follow written documents that he would have preferred to manipulate. But the record didn't support a claim that that in and of itself deprived him of due process. So we didn't raise it. I appreciate the clarification. I wish I had now. As to the complaint to the police department, Judge Cabranes, on page 170 of our appendix at paragraph 134, you'll get some illumination there. Mr. Doe went to the campus police department, and the public safety people, according to him, told him they didn't consider it stalking. Candidly, if that's all I had, I wouldn't have come here, I don't think, because I'm not sure that the opinion of the receiving investigating officer at the campus police department binds the investigation as a whole. So I was not impressed with that. But what I want to focus on is why I think we're here, and that is the character of the counterclaim. I mean, he acknowledged that he violated the NCO. He was told, because you're up front about it, things will go well. Well, we'll take that into consideration. This, together with McFarland's assurances that everything would be fine. And I disagree with my colleague in the instance that McFarland doesn't have to be a policymaker here in order for that to be a clear and definite promise. And calling it a forecast, well, that's not quite a promise, but it's from someone who's in a position to know. And this is why I think the Lafler case is so instructive. You know, Mr. McFarland didn't need to be a lawyer, but he was in an advisory capacity, a quasi-lawyerly role in a quasi-judicial proceeding, giving advice to a young man who needed it. And he said, you'll never be expelled here. And then a policymaker said, don't worry, you were square with us on the NCO. It's not going to be a problem. And you can bring your counterclaim later. And then when he does, they say, well, we don't do that once we've expelled you. He got sandbagged. And the result is- Mr. Patterson, you view all of that as adequate for a kind of due process claim? I do. I think it raises questions about the fairness of the proceedings, both procedurally and substantively. I mean, again, take a look at your leisure at the material in paragraphs 305 and 310 of the statement of material facts. I'll pick up where I left off before. She followed him in a park. She took a picture of him naked without his consent. She contacted his ex-girlfriend. The university official conceded these were potential violations. Now, if my client's going to be accused of violating something, he's going to get a robust cross-examination. And that cross-examination is going to be along the form of you did the same thing. You won the race to the police. You know, the first person to the police station is the victim. The other person's got some explaining to do. But how is that discrimination? Even if there is a bias for who runs to the police first, how is that gender discrimination? I think this together with the chart suggests that when a woman goes first, she's believed. When a guy goes, he doesn't, you know, I don't know. You see disparate outcomes. And so I think it undermines the confidence that this court or any court should have in the factual findings. I'm not saying we'd win if we go to trial. My adversaries have done a very thorough job investigating this case, and they're fearsome. But I do think there are issues of material fact and inferences that could be- So you think that it is- A jury worthy. You think it's the main thing is the spreadsheet. On that claim, correct. And then as to whether he got a fair hearing, the claim would be McFarland's role in the assurances that everything would be fine. He could bring a claim later. No, I thought that was your promissory stop. It's part of it, but I think you need to read it as a whole, Judge, because, I mean, it tells one story. And it explains some of the litigation decisions that he made. Counsel, even if they both at different times harassed each other, doesn't his harassment justify action by the university? I mean, if two people are involved in a gunfight, you can charge either one with being a shooter. Of course, in that case, you might have a self-defense claim. And in this case, he might have a, this is a troubled relationship, which is really what all it was. I'm not a sexual predator, and I ought not to be labeled as such for the rest of my professional career. Instead, the record was manipulated in such a way that when he tried to raise these issues to cross-examine her, oh, no, no, no, they're not relevant. You can bring that in the hearing. You'd never get to bring- No, you said to cross-examine her. Correct. But cross-examination of her isn't going to change what he did. It might, depending on how much weight the fact finder placed on her testimony. If it found out she's doing the very same things to him that she says he did to her, that might make the case look a little different. And the sanction might have been something other than expulsion. It might have been joint counseling, which in our view is what should have happened here. Thank you so much. Thank you. Thank you, Judge. Thank you, Judge.